UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| VS. | * | DOCKET NO. 2:18-cr-12-JAW |
| | * | and 2:18-cr-173-JAW |
| DEMONE COLEMAN | * | |
| | * | |

SENTENCING MEMORANDUM

Now Comes the defendant, Demone Coleman, and submits the following as his Sentencing

Memorandum:

1.      The Convictions

On December 19, 2019, the defendant, Demone Coleman, appeared before this court and

entered a plea of guilty to charges contained in two distinct Indictments. One of the Indictments

(Docket No. 2-18-cr-173-JAW), arrived in the District of Maine as a result of a Rule 20 transfer

from the District of Massachusetts.[1] Rule 20 allows the transfer of a prosecution from the district

"where an Indictment ....  is pending" to another district where the defendant is "arrested, held, or

present," but only upon the written consent of the defendant and the prosecutors in each district, and

only for the express purpose of the entry by the defendant of a plea of guilty or nolo contendere in

the receiving district. In addition to pleading guilty to the transferred Massachusetts Indictment,

Coleman also plead guilty to the charge contained in a pending Maine Indictment in Docket No.

2:18-cr-12-JAW.

In connection with the transferred Indictment, Coleman plead guilty to four counts of

---

[1]The Docket Number in the District Court for the District of Massachusetts was 1:18-cr-10106-PBS.

Distribution of Cocaine Base, in violation of 21 U. S. C. § 841(a)(1), subject to the penalty provisions of 21 U. S. C. § 841(b)(1)(C). In connection with the Maine Indictment, Coleman plead guilty to one count of Possession With Intent to Distribute Cocaine Base, in violation of 21 U. S. C. § 841(a)(1), subject to the penalty provisions of 21 U. S. C. § 841(b)(1)(B). The single count in the Maine Indictment carries a five year mandatory minimum period of imprisonment.

**2.      The Guidelines Calculation**

The pre-sentence report properly aggregates all of the drug quantities from the conduct charged in both counts and applies a base offense level of 24 from the Drug Quantity table found at § 2D1.1(c). All of the defendant's conduct occurs from May 31, 2017, to November 1, 2017, and constitutes "part of the same course of conduct or common scheme or plan" pursuant to § 1B1.3(a)(2). On the basis of the four transactions outlined in the transferred Indictment, and the single seizure in Maine, the defendant is being held accountable for 37.48 grams of cocaine base. The guidelines provide that an offense involving at least 25 grams, but less than 112 grams, of cocaine base has a base offense level of 24. The pre-sentence report subtracted three levels on the basis of the defendant's acceptance of responsibility, resulting in a total offense level of 21. The defendant has three criminal history points based on conduct occurring in May, 2006, which resulted in the February, 2007, conviction listed in ¶48 for simple possession of cocaine base, in violation of 21 U. S. C. § 844. On that matter, the defendant received a sentence of 96 months of imprisonment, followed by 36 months of supervised release.[2] In 2009, his sentence was reduced to

---

[2]The defendant was held accountable in that case for 9.21 grams of cocaine base. In 2006, simple possession of cocaine base in an amount exceeding 5 grams carried a five year mandatory minimum. At that time, cocaine base in an amount of at least 5 grams, but less than 26 grams, produced a base offense level of 26. Coleman received acceptance, so his total offense level was 23. His criminal history score placed him in Category V, resulting in a guideline range of 84-105

87 months as a result of the retroactive application of the sentencing commission's reduction of the guidelines for crack cocaine. He was released to supervision in 2013, and successfully completed his term of 36 months of supervised release in 2016. One petition regarding his supervision was brought in 2014, but this was handled by modifications of his conditions, and that petition was ultimately withdrawn without any findings in 2015.

On the basis of a total offense level of 21 at criminal history category II, the defendant's advisory guideline range is 41-51 months. However, the admitted drug weight in excess of 28 grams of cocaine base triggers the penalty provisions of § 841(b)(1)(B), so the defendant's guideline range for imprisonment becomes 60 months.

**3.     Mitigation Arguments**

**a.     History and Characteristics of the Defendant**

Demone Coleman was born on April 1, 1979, which makes him 40 years old. He grew up essentially as the only child in his household, living in Dorchester, Massachusetts, with his mother and grandmother. He never interacted with his father until he was 14 years old because his father was serving an extend period of imprisonment on the basis of a federal drug conviction. His mother suffered from addiction to crack cocaine. According to the defendant's own Massachusetts Department of Youth Services records, his mother had a lengthy history of alcohol and substance abuse, and was involved in the criminal justice system for charges including public drunkenness and

---

months. Today, a conviction for a violation of 21 U. S. C. § 844 for possession of cocaine base in the amount of 9.21 grams would expose the defendant to imprisonment for not more than one year. A conviction for possession *with intent to distribute* cocaine base in violation of 21 U. S. C. § 841(a)(1) would have no mandatory minimum, would produce a base offense level of 16, and, with acceptance, a total offense level of 14, and at criminal history category V result in an advisory guideline range of 33-41 months.

drug use. The defendant indicated that his mother's circumstances were "real stressful" for him, and he noted that he worried about her all the time. He remembers that he often gave her money for drugs, and he remembers the sense of embarrassment he experienced when this occurred in front of his friends or associates. He recalls that when his mother would receive her welfare check, she would leave the home for two or three days to "do her thing." He stated in the pre-sentence interview that his mother is still using drugs.

His mother has been in a relationship with Isshiha Hooks since 1999, and this relationship produced the defendant's only maternal half-sibling, his half-brother Isshiha Coleman. On the paternal side, however, the defendant is one among ten children of Edward DeJesus. The defendant's DYS records indicate that his step-father, Isshiha Hooks, was incarcerated for gun trafficking charges.

The person most responsible for caring for the defendant was his grandmother, who supported the family by working as a home health aide. His grandmother was a functioning alcoholic, but she was always present. His mother was frequently not present, and even when she was at home she was most often not available. Neither his mother or grandmother, however, were truly capable of controlling his behavior. While he does not describe "neglect" in his early home life, he remembers that his grandmother would beat him if he caused trouble at home. He also recalls that when his father was released from prison, he also played a role as a disciplinarian. The defendant explained what this meant by saying that when the he starting to get into trouble with the law as an adolescent, his father would beat him as well.

The streets of Dorchester were a difficult place for a boy to grow into a young man. The report cites the medical records from Whittier Street Health Clinic in Boston reflecting that the

4

defendant has continuing complications arising from a bullet which still remains in his right hip as a result of being shot when he was 14 years old. The pre-sentence report from his prior conviction reflects that the defendant was also treated at Boston Medical Center for a second gun shot wound in July of 2000, when he was 21 years old. The defendant reports that he was unarmed on both occasions when he was shot. In the first instance, he was at a skating rink when a dispute erupted between an associate of his and a third party. He was not involved in the dispute, but was hit in the cross fire. On the second occasion he was shot in the shoulder in a drive-by incident as he was driving home from a club with Latasha Brown. He never knew who shot him or why they did so.

The older pre-sentence report also states that the defendant bears a scar from a stab wound to his right shoulder from an altercation in 2000. One DYS assessment described a "gang subculture" in the defendant's neighborhood. That assessment also noted that the defendant, as a child, had sold drugs and carried weapons, and also noted that he "has been the victim of violence in the community." Near in time to when Demone was shot in 1993, he completed a psychological evaluation after bringing a knife to school which revealed that he was emotionally "quite fragile," and struggled with self-esteem. As a result, he had anger problems, difficulty with authority, and interpersonal aggression.

Demone told the probation officer he had previously received social security benefits as a result of mental health issues. The report confirms the receipt of benefits, and Demone's mother informed the officer that his diagnosis was for post-traumatic stress disorder. As a juvenile, he was also diagnosed with attention deficit disorder, anxiety and depression, but he did not take the medication he was prescribed.

Demone noted to the probation officer that his first use of alcohol was when he was 12 years

old. He claimed that he never really had a problem with alcohol. However, at the time of his prior pre-sentence report in January of 2007, he told that officer that he used to drink "shots" of Hennessy and "chased" them with beer. In both reports the defendant indicated daily use of marijuana dating back to when he was 12 years old. Prior to being arrested for the present matter, Demone said he was smoking six to eight marijuana "blunts" per day, and that he had used marijuana at this rate since 1998. He said he wanted to be high all of the time so he did not have to deal with daily stressors.

In terms of personal relationships, it appears that Demone has been able to maintain positive relations with the significant people in his life. Demone has been in a relationship with Shelela Smith since 1993. They share a son, Loyal Coleman, who resides with Smith and the defendant's mother in Boston. This is where the defendant wants to return upon release. He also maintains a positive relationship with his older daughter, Demya Coleman, and her mother Latasha Brown. Demone asserts that this is true despite the indications in the report about the presence of two civil restraining orders over the period from 2014 to 2017. Demone notes frequent contact with Demya, and a positive relationship with Brown. It is also noteworthy that Demone states he has a positive relationship now with both his mother and father. In fact, his father has authored a letter of support on Demone's behalf that has been submitted to the court, and his father anticipates appearing at court for the sentencing hearing.

It appears that Demone responded in a very positive fashion to the supervision he received from the probation office during the 36 months following his prior period of custody. The only hiccup during the entire three year period of supervision was a petition in 2014 that resulted in an agreed modification of conditions, and a subsequent withdrawal of the petition without any finding of a violation. It also appear that Demone was, for the most part, employed during this period of

time. The report, in ¶91, talks only about his involvement with the Laborer's Local Union 609, but Demone had other employment during this period. When he was first released to supervision, he was employed with Boston Solar in Woodburn, Massachusetts, for approximately seven months. He then became a representative for Local Union 609 and worked a job for five months with Consigli Construction. Thereafter he put his name on the board at the union hall, and work briefly at several other jobs. He was also employed at Ray Ray Services, 552 Blue Hill Avenue, Dorchester, MA, moving furniture. This work was off and on, and his pay was under the table.

**4.      Recommended Disposition**

Demone Coleman is requesting that the court impose a sentence of imprisonment for 60 months followed by four years of supervised release. The defendant is also seeking the imposition of special conditions in connection with his supervised release that will enable him to receive a full mental health evaluation, and to participate in any mental health treatment that is recommended as a result of such an evaluation. The defendant would also welcome any "work ready" programing, or vocational training that might be available through his supervision. He would also welcome drug testing, and any substance abuse recovery programming that may be deemed to be appropriate for his circumstances. Demone recognizes that he is getting older, and he does not want to live the same life style of installment incarceration that has characterized his life to this point. He is committed to his relationship with Shelela Smith, and he wants to build on his relationships with both of his children.  He is also committed to making the changes that are necessary in himself to protect these interests. He does not want to let his family and himself down any more.

In this case, the 60 month mandatory minimum sentence is actually nine months in excess of the imprisonment range advised through a strict application of the guidelines. The defendant

suggests that the difference between the range advised by strict application of the guidelines, and the five year term required by the statute, is an appropriate upward adjustment in light of any perceived aggravating factors related to his prior criminal history. The defendant also suggests that 60 months of imprisonment and a term of four years of supervised release, adequately conditioned with the appropriate interventions to provide the defendant with needed mental health care, vocational training, and other correctional treatment in the most effective manner, is sufficient, but not greater than necessary to serve the purposes of criminal sentencing articulated in § 3553(a). The defendant suggests that the remedial conditions associated with supervised release are actually the most effective way to protect the public from the possibility of further crimes by this defendant. Incarceration does not remediate the issues underlying the defendant's conduct. Rather, incarceration for an extended period will either simply preserve or exacerbate those underlying issues, to the detriment of whatever community to which the defendant is ultimately released.

Accordingly, the defendant, Demone Coleman, prays that this court impose a sentence of 60 months imprisonment; followed by four years of supervised release, subject to whatever conditions the court deems to be appropriate.

Dated: May 15, 2019

/s/J. Hilary Billings, Esq.
Attorney for Defendant
Assistant Federal Public Defender
Counsel for the Defendant
P.O. Box 595
Portland, Me 04112-0595
207-553-7070
FAX: 553-7017
J.Hilary.Billings@fd.org

UNITED STATE DISTRICT COURT
DISTRICT OF MAINE

**CERTIFICATE OF SERVICE**

I, J. Hilary Billings, hereby certify that I have, this date, caused the within Sentencing Memorandum, to be served upon Assistant United States Attorney David Joyce, Esq., by forwarding a copy of this pleading to him electronically via the court's ECF system.

/s/ J. Hilary Billings
J. Hilary Billings, Esq.
Counsel for the Defendant

Dated: May 15, 2019